STATE of Iowa, Appellee,

v.

Nathan John KOLBET, Appellant.

No. 99–0046.

Supreme Court of Iowa.

Nov. 15, 2001.

Rehearing Denied Feb. 7, 2002.

Judith O'Donohoe of Elwood, O'Donohoe, O'Connor & Stochl, Charles City, for appellant.

Thomas J. Miller, Attorney General, Kevin Cmelik, Assistant Attorney General, Richard Tekippe, County Attorney, and Peter Grady, Assistant Attorney General, for appellee.

CARTER, Justice.

Defendant, Nathan John Kolbet, appeals from convictions of homicide by vehicle in violation of Iowa Code section 707.6A(2)(a) (Supp.1997) and serious injury by vehicle in violation of Iowa Code section 707.6A(4). He contends that the State's proof of speed, which was the essential evidence of the reckless-operation element of the offenses of which he was convicted was invalid on its face and that rebuttal evidence on the issue of speed was offered by the State in bad faith. After reviewing the record and considering the arguments presented, we reverse defendant's convictions on both offenses and remand for a new trial on these charges.

Defendant, a twenty-year-old college student, resided with his parents in rural Alta Vista on October 5, 1997, the date of the motor vehicle mishap that produced the criminal charges which are at issue. On the day prior to the accident, he worked until 10:30 p.m. at a home providing care for mentally handicapped teens in Charles City. Upon getting off work, he went to visit a friend. The friend was having a party where beer was consumed by those present, including defendant. At 2 a.m. defendant drove a woman home from the party, had one more beer, and then drove seven miles home without incident. His mother awoke him at 7:30 a.m. on the following morning, which was a Sunday. He left for work at 8 a.m. and proceeded to drive west on county road B28. It was eighteen miles from his home to his workplace in Charles City. He was due at work at 8:30 a.m.

After driving 4.3 miles, defendant encountered a horse-drawn buggy on the county road and passed it. The buggy driver and his wife testified at the trial that they remembered the car passing them and thought it was going too fast, probably over the speed limit. Defendant proceeded west another two miles when he encountered another horse-drawn buggy, which was also traveling in a westerly direction. Although defendant braked and steered to the right, his vehicle struck the right rear corner of the buggy, which at

the time of the collision was slightly to the left of the centerline.

During the collision, defendant's head was thrown against the windshield of his car. His skull was fractured and the hippocampal structure of his brain was injured. As a consequence of those injuries, he is unable to recall any details of the collision.

The occupants of the buggy were the Oberholtzer family, a husband and wife and their five children. On impact they were all thrown onto the road. The two adults were sufficiently injured that they were unable to recall any of the details of the accident. Three of the children were uninjured. The two youngest children, a seven year old and a baby, sitting immediately above the point of impact, were catapulted from the buggy and seriously injured. Katie Oberholtzer, age seven, later died of cerebral edema. The baby, Ruth Oberholtzer, who had been sitting on Katie's lap, suffered a serious head injury.

The damaged buggy and the injured horse, which had been pulling it, remained on the roadway following the collision. The right rear wheel of defendant's automobile went off the traveled portion of the highway on the north side of the road. The auto then changed directions, veered into the ditch on the south side of the roadway, passed through a fence into a farm field, and then traveled in a circular path back into the ditch on the south side of the road. The couple in the buggy that defendant had passed were the first witnesses on the scene. They testified that the engine on defendant's auto was roaring when they arrived. The engine continued to run under power until a fire department rescue unit employee arrived about 8:40 and disconnected the battery cable.

One of two state troopers arriving on the scene about 8:30 shot and killed the horse, whose rear legs were both broken.

One of the troopers testified that he discovered a punctured beer can in defendant's auto, which had sprayed beer throughout the front seat near where the driver was seated. He also testified that he smelled alcohol on defendant's breath. He administered a preliminary breath test and obtained a reading of .112. After defendant was taken to a hospital by ambulance, the trooper arrived there, completed the implied-consent procedure, and took a sample of defendant's blood. The laboratory test results showed a blood alcohol reading of .110.

In investigating the accident, state trooper Bryan Shupe identified skid marks made by defendant's auto prior to the collision and also identified postimpact yaw marks made while the car sideslipped toward the ditch following the collision. These yaw marks first revealed the location of one, then two, and ultimately all four tires as they traveled along the road for a distance of 170 feet from the point of impact. Trooper Shupe took measurements of the location of these marks and prepared a diagram showing where they were located with respect to the roadway, the ditch, and the point of collision.

At trial state trooper Dennis Gerdom, who had received special training in accident reconstruction, was allowed to testify over defendant's objection concerning his calculation of the approximate speed of defendant's vehicle prior to braking, based on markings that the tires left on the roadway. He based his conclusions on his application of certain mathematical formulas applied to the skid marks and yaw marks shown on trooper Shupe's diagram. From the arcing pattern of the yaw marks, he calculated that defendant's vehicle was traveling between sixty-two and sixty-nine miles per hour when the marks were laid down. That was the speed that would have produced the radius of the arc, given

the weight of the vehicle and the coefficient of friction for the roadway. He combined that speed with the amount of deceleration that he was able to compute from the skid marks leading up to the point of impact. Based on this methodology, he concluded that immediately prior to braking defendant's auto was traveling between seventy-one and eighty-two miles per hour.

Trooper Gerdom's testimony made clear that he did not base his testimony on the skid marks alone, that the postimpact yaw marks were critical to his calculations, and that his calculations would only be accurate if defendant's auto was not under power when the postimpact yaw marks were laid down on the roadway. This was also implicit in Shupe's testimony. Both Gerdom and Shupe testified that, based on their observation of the yaw marks, they did not believe that they were laid down by a vehicle under power.

Michael Throndson, a certified master mechanic, testified on behalf of the defendant. He testified that he had examined defendant's automobile following the collision and observed the severe damage in the engine compartment that forced the cruise control servo rearward, stretching and locking into place the cable controlling acceleration. Defendant's vehicle had front-wheel drive, and Throndson testified that this would have kept the engine providing power to the front wheels until the ignition was turned off.

James Sobek, a licensed engineer and an accident reconstruction expert, testified that he examined defendant's auto after the collision and that the cruise control mechanism had been forced into the position that Throndson had described. He further testified that, based on the damage to the buggy and the angle of impact, the collision with the buggy had caused the damage that occurred to the cruise control mechanism.

Sobek testified that Gerdom's method of calculating the speed of defendant's auto would only be accurate if the vehicle was not under power when the postcollision yaw marks were laid down. He testified that the photographs of the yaw marks revealed a substantial difference in appearance between the marks left by the front wheels and the marks left by the rear wheels. He attributed that difference to the fact that the front wheels were operating under power and the rear wheels were not.

Sobek testified that he had made computer calculations, which showed that the yaw marks shown on Shupe's diagram (used by Gerdom for his calculations), could only have been laid down in that pattern if defendant's auto was under power and accelerating from a departure speed at point of impact of forty to forty-five miles per hour. Finally, Sobek testified that his own calculation of the speed of defendant's vehicle immediately prior to braking was fifty to fifty-four miles per hour, based on the skid marks and the calculated acceleration speed while the yaw marks were being laid down.

The State called sergeant Randall Bulver as a rebuttal witness. Bulver was a supervisor of technical accident investigation for the Iowa State Patrol. He testified that, for purposes of estimating speed from yaw marks by means of the formula trooper Gerdom had applied, the result would be the same irrespective of whether the vehicle was under power or free wheeling. He buttressed this conclusion by stating that it was revealed to him by research he had performed in materials published by the Northwestern University Traffic Research Institute.

Defendant called as a surrebuttal witness, Jerry Lee Hall, who held a doctorate in mechanical engineering. Hall testified

that Bulver's contentions that, if the wheels of the car were operating under power, Gerdom's calculations would nevertheless be accurate was contrary to elementary laws of physics. He testified that, if the front wheels of the vehicle were operating under power, application of the mathematical formulas that Gerdom used to estimate speed would produce a "higher than accurate" speed.

The published materials on which Bulver purported to rely in his testimony were not available to Hall when he testified at trial. In connection with defendant's motion for a new trial, Hall filed an affidavit in which he stated that he had reviewed those published materials, that they did not support Bulver's assertions, and, in fact, expressly contradicted them. Copies of those portions of the materials published by the Northwestern University Traffic Research Institute that contradicted Bulver's assertions were attached to the motion for a new trial. They state in part:

> The equations presented . . . for velocity estimates from side slip are derived with the assumption that no longitudinal acceleration . . . was present during the yaw. This means that neither braking nor power was applied to the vehicle during the yaw. . . .

The State made no effort in the district court to discredit Hall's affidavit or the exhibits attached thereto. It similarly makes no effort to do so on appeal.

The information filed against defendant charged in the alternative the commission of the offense of homicide by vehicle caused by operating while intoxicated, a class "B" felony, in violation of subparagraph (1) of Iowa Code section 707.6A and the offense of homicide by vehicle caused by driving in a reckless manner, a class "C" felony, in violation of subparagraph (2)(a) of that statute. He was also charged with serious injury by vehicle, a class "D" felony, in violation of subparagraph (4) of section 707.6A. The jury acquitted defendant of homicide by vehicle caused by driving while intoxicated, but convicted him on the other two charges. Other facts that are significant in deciding the appeal will be considered in our discussion of the legal issues presented.

## I. *The Speed Issues.*

Defendant argues that the testimony offered by the State to show the speed at which he was driving was of absolutely no probative value because the yaw marks on which it was based were laid down while his vehicle was operating under power. He contends that no other credible evidence of his speed was presented except that of his own expert witness. He urges that, absent credible evidence of dangerously excessive speed, there was no evidence that would allow the jury to reasonably conclude that he was driving in a reckless manner.

In the alternative, defendant argues that, if there was a jury issue concerning whether the yaw marks were laid down while the vehicle was under power, he is entitled to a new trial because sergeant Bulver's testimony negating the consequences of an adverse finding on this issue was false and misleading.

The issues thus framed do not pertain to the admission of expert testimony. They pertain to the sufficiency of the evidence to establish recklessness, the weight of the evidence for purposes of defendant's motion for new trial, and the allegations of bad faith in presenting sergeant Bulver's testimony.

In considering the sufficiency of the evidence to support a verdict, we must base our decision on all of the evidence in the record, not merely that which favors the State. *State v. Conroy,* 604 N.W.2d

636, 638 (Iowa 2000); *State v. Kostman,* 585 N.W.2d 209, 211 (Iowa 1998); *State v. Robinson,* 288 N.W.2d 337, 340 (Iowa 1980). That type of review poses problems for the State because it is undisputed that the engine on defendant's auto was roaring when it came to rest in the ditch and remained so until the battery cable was disconnected. Two witnesses testified without contradiction that the engine cavity had been damaged in a manner causing the cruise control mechanism to be locked in position thus holding the engine under power. The obvious explanation for this damage to the cruise control mechanism was the collision with the buggy. When all of this evidence is considered, the State's evidence of speed rests on a very speculative foundation.

In ruling on defendant's motion for a new trial, the district court characterized the conflicting evidence as to the speed of defendant's vehicle as a matter for the jury to resolve. Although an allegation that Bulver's testimony was either perjurious or made with a reckless disregard for the truth was part of defendant's motion for new trial, the court did not address that claim directly. In lieu of discussing the challenge to Bulver's testimony, the court concluded:

> There was additional evidence before the jury of defendant's recklessness in the operation of the vehicle, so as to sustain the jury's verdict. The court concludes defendant has not shown that any use of false testimony would, within a reasonable probability, have influenced the jury verdict. Other evidence in the record sustains the jury's verdict.

■ Unlike the stricter standard of materiality applied to new-trial motions based on newly discovered evidence, a knowing use of false testimony requires that a conviction be reversed "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs,* 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342, 349–50 (1976); *accord Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104, 108 (1972). This standard may be applied even if the prosecutor did not actually know the testimony was false but should have known. *Agurs,* 427 U.S. at 103, 96 S.Ct. at 2397, 49 L.Ed.2d at 349. In *United States v. Tierney,* 947 F.2d 854 (8th Cir.1991), the federal court extended this principle to the reckless or negligent use of false testimony. *Tierney,* 947 F.2d at 860–61.

■ In applying these principles to the present case, we are convinced that the State's use of Bulver's rebuttal testimony constituted a reckless disregard for the truth. Although the formulas that were used by trooper Gerdom to estimate speed are highly technical and complex, it is elementary that, if the speed of a vehicle prior to collision is to be estimated from the tire marks laid down as the vehicle slides to a stop after the collision, the forces propelling the vehicle when the tire markings are being laid down must be the same forces that existed prior to the collision. To suggest that the results would be the same irrespective of whether the vehicle was under power or was freewheeling is absurd because the spacing and duration of the markings laid down by the tires would almost certainly be different in each situation. Any lingering doubt as to the reckless use of Bulver's testimony is dispelled when we consider his testimony that his conclusions were supported by materials published by the Northwestern University Traffic Research Institute. The State has made no effort to bolster the credibility of that statement in the face of evidence that it was not correct and has offered no explanation as to why this manifestly false claim was made.

We are convinced that there was a strong likelihood that Bulver's false testimony could have affected the verdict. As we concluded in our prior discussion, the evidence that the vehicle remained under power following the collision was extremely convincing. The jury could very likely have so found. Such a finding would have completely eliminated the State's claim that defendant was driving between seventy-one and eighty-two miles per hour prior to the collision.

■ We disagree with the district court's conclusion that there was other evidence of recklessness that would likely have caused the jury to conclude that defendant was operating his vehicle in a reckless manner. Section 707.6A(2)(a) requires that the reckless driving be done with a willful or wanton disregard for the safety of others. The evidence relied upon by the district court to conclude that this could be shown in the absence of Gerdom's speed testimony was that (1) defendant had been observed driving over the speed limit two miles back down the road, (2) defendant would have observed a "slow moving vehicle" sign on the rear of the buggy, (3) defendant did not have his vehicle under control, (4) he failed to reduce his speed when approaching the buggy, and (5) he had stated to others that he believed that he may have fallen asleep. Also, the district court believed that defendant's blood alcohol concentration could be considered on the issue of recklessness.

Considering the district court's conclusion concerning defendant's blood-alcohol content, we do not believe that, in deciding what the jury would have done without Gerdom's speed evidence, we can rely on the evidence of intoxication, which that same jury rejected in acquitting defendant of the charges under Iowa Code section 707.6A(1). As to the possibility that defendant fell asleep, we believe that, under the circumstances of this case, this would militate against a finding of willful and wanton disregard, rather than in support of such a finding. We are unable to conclude that the other factors relied on by the district court or any other evidence presented to the jury would permit it to find reckless operation in the absence of evidence of dangerously excessive speed. *See State v. Sutton*, 636 N.W.2d 107, 112–13 (Iowa 2001). Consequently, we believe there is a sufficient likelihood that Bulver's testimony affected the verdict of the jury that the judgment of conviction should be reversed and a new trial granted.

## II. *Other Issues Involving the Validity of the Charges or Procedural Matters Arising During the Trial.*

■ A. *Motion for judgment of acquittal.* Defendant urges that he was entitled to a directed verdict because the evidence of speed offered by the State was unreliable, and absent such evidence there was no basis to conclude that he was driving in a reckless manner. As noted in our prior discussion, we agree that absent evidence of grossly excessive speed there was no basis to conclude that defendant was driving in a reckless manner with a willful and wanton disregard for the safety of others. On the issue of speed, we conclude that the reliability of Gerdom's speed estimates was a question for the jury because the jury was not bound to credit the testimony of defendant's expert witnesses that the cause of the cruise control cable being locked into place was the collision with the buggy. Factual disputes concerning the foundational facts for the opinions of expert witnesses are matters for the jury to decide. *Preferred Mktg. Assocs. Co. v. Hawkeye Nat'l Life Ins. Co.*, 452 N.W.2d 389, 393 (Iowa 1990); *see also State v. Atwood*, 602 N.W.2d 775, 784 (Iowa 1999). If the jury believed officer

Gerdom's estimates of the speed of defendant's vehicle, we believe that that factor coupled with the other elements involved in the collision would support a finding of willful and wanton disregard for the safety of others.

■ B. *Noninclusive-title challenge to Iowa Code section 707.6A.* Defendant lodged a noninclusive-title challenge to section 707.6A based on the provisions of article III, section 29 of the Iowa Constitution. That constitutional provision requires that the subject of an act must be expressed in the title. The provisions of section 707.6A pertaining to death resulting from operating while intoxicated are adequately described in the title of the bill. However, there is no mention in the title of the provisions pertaining to death caused by reckless operation of a motor vehicle.

■ We conclude that defendant's constitutional challenge to the statute is untimely because the act in question was codified prior to the time that it was challenged in defendant's criminal trial. Once a bill is codified, any constitutional defect relating to either the title requirement or the single-subject requirement of article III, section 29 is cured. *State v. Mabry,* 460 N.W.2d 472, 475 (Iowa 1990). In the present case, the statute was enacted in the spring of 1997 and became effective on July 1, 1997. The Code containing the amendment was released by the Code Editor on January 8, 1998. That was the date beyond which no constitutional challenge based on a noninclusive title could be lodged. *See Iowa Dep't of Transp. v. Iowa Dist. Ct.,* 586 N.W.2d 374, 377 (Iowa 1998). Defendant did not present the court with a challenge to the statute until April 17, 1998.

Defendant contends that he did not have standing to challenge the act until the criminal charges were brought against him. He argues that the constitutional challenge that he lodged to the statute on April 17, 1998, should relate back either to the date of the victims' death and injury or the date on which criminal charges were filed (January 5, 1998). We are convinced that the language in *Mabry,* 460 N.W.2d at 475, requires that a constitutional challenge of this nature must actually be presented to the court prior to codification. This was also recognized in *State v. Taylor,* 557 N.W.2d 523, 526 (Iowa 1996). We recognize that this limitation means that the window of opportunity for challenging a statute on this ground is entirely fortuitous because persons are not motivated to challenge a statute until they are placed in a position in which the statute adversely affects them. Nevertheless, this is an inescapable conclusion of the *Mabry* doctrine.

■ C. *Equal protection.* Defendant asserts that section 707.6A violates equal protection of law under the Fourteenth Amendment to the Federal Constitution and article I, section 6 of the Iowa Constitution because it discriminates between perpetrators of different acts of homicide embraced within the statute. The Colorado Court of Appeals was asked to address substantially the same question in *People v. Loeser,* 981 P.2d 197 (Colo.Ct.App.1999). The Colorado court concluded that disparate penalties for homicide by vehicle caused by drunken driving and homicide by vehicle caused by reckless driving do not violate equal protection because a defendant in one situation is not similarly situated with a defendant in the other situation. *Loeser,* 981 P.2d at 198. The holding of the Colorado court is generally consistent with the views we expressed in *State v. Ramirez,* 597 N.W.2d 795, 798 (Iowa 1999) (generally if elements differ penalties may differ without violating equal protection). We find no merit in defendant's equal protection challenge.

D. *Due process.* Defendant asserts that section 707.6A denied him due process of law because the statute does not require a specific criminal intent as an element of guilt. We reject this contention because it is based on an invalid assumption. Defendant was convicted of reckless operation of a motor vehicle. The statutory provisions that establish the crime specify "driving a motor vehicle in a reckless manner *with willful or wanton disregard* for the safety of persons or property." Iowa Code § 707.6A(2)(a) (emphasis added). That definition is incorporated by reference in the offense involving serious injury by reckless operation. Iowa Code § 707.6A(4). The requirement of a willful or wanton disregard for the safety of others establishes a *mens rea* element that is essential to a finding of guilt.

██ Defendant also challenges the statute on due process grounds because it provides an inadequate definition of causation. We also reject that contention. With respect to the homicide-by-vehicle charge involving reckless operation, the statute expressly requires the State to prove that the defendant

unintentionally *causes the death of another by any of the following means:*

. . . .

a. Driving a motor vehicle in a reckless manner with willful or wanton disregard for the safety of persons or property. . . .

Iowa Code § 707.6A(2)(a) (emphasis added). These provisions are incorporated by reference in the statute creating the offense involving serious injury by reckless operation of a motor vehicle. Iowa Code § 707.6A(4). A cause-in-fact requirement is thus clearly spelled out as an element of these offenses.

██ E. *Denial of defendant's motion to suppress evidence and challenge to the manner in which the blood sample was handled.* Defendant asserts error in the manner in which the implied-consent law was implemented and in the manner in which the blood sample was handled. In Division I of this opinion, we determined that in deciding what the jury in the present case would have done absent tainted evidence, we could not consider any evidence bearing on defendant's intoxication, which the same jury rejected in acquitting him of the charge of vehicular homicide while intoxicated. We now further hold that, under the doctrine of collateral estoppel and the evidentiary relevance consequences that flow from the application of that doctrine, another jury on retrial should be precluded from considering any such evidence in its determination of the charge of vehicular homicide by reckless driving.[1] This renders it unnecessary to consider defendant's challenges to this evidence during his first trial.

██ F. *Excluding comment on the serious penalties imposed for conviction of the offenses charged.* Defendant asserts

---

1. When an original acquittal must have turned on a finding that the defendant had not done a particular act, his commission of that act may not be relitigated in another criminal trial. *Ashe v. Swenson,* 397 U.S. 436, 443–44, 90 S.Ct. 1189, 1194, 25 L.Ed.2d 469, 475–76 (1970); *see also* Chester James Antheau & William J. Rich, *Modern Constitutional Law* § 40.51, at 638 (1997) (doctrine applies if there is strong evidence that the particular issue was resolved in a prior trial).

In the present case, the defendant was acquitted of the crime in which one of the elements was operating under the influence of alcohol. The jury was instructed the defendant would be driving in that manner if his ability to drive was impaired in any manner by the consumption of alcohol. The acquittal of defendant on this charge must have resulted from the jury finding that defendant was not so impaired.

that the district court erred in not allowing him to inform the jury of the serious penalties that befall a person who is convicted of the charges against him. The district court concluded that this knowledge was not relevant to the issue of guilt or innocence, which was the only issue for the jury's consideration. We agree. The court was well within its discretion to keep such information from the jury.

■ G. *Requiring defendant to submit a witness list prior to* voir dire. Defendant contends that the district court erred in requiring him to submit a list of his witnesses to the prosecution for aid in *voir dire.* We agree that the court erred in imposing this requirement. Iowa Rule of Criminal Procedure 13 governs the State's right to discovery in a criminal case, and nothing therein contained provides a basis for the State to demand production of a list of defendant's witnesses.

■ H. *Refusal to permit a view of the car and view of the crime scene.* Defendant contends that the district court abused its discretion in not permitting the jury to view the car or the crime scene. We disagree. Whether or not to accede to defendant's request was a matter falling within the broad discretion of the district court. *See State v. Haines,* 259 N.W.2d 806, 811 (Iowa 1977).

I. *Whether restitution requirement of section 910.3B violates double jeopardy protections or constitutes an excessive fine.* The arguments that defendant has made challenging Iowa Code section 910.3B on grounds of double jeopardy and an excessive fine have been completely answered in prior decisions of this court. *See State v. Izzolena,* 609 N.W.2d 541, 552–53 (Iowa 2000); *State v. Klawonn,* 609 N.W.2d 515, 519 (Iowa 2000). Those decisions require that we reject these contentions.

■ J. *Personal bias of the judge.* As a final matter, we consider defendant's contention that the judge who presided at trial erred by not recusing herself at defendant's request. That request came on the third day of the trial and was based on information that defendant had received indicating that the judge's father had been killed in a collision with an intoxicated driver.

In response to defendant's recusal motion, the judge acknowledged that her father had been killed in an automobile collision fourteen years prior to the trial. The driver of the other vehicle, who was also killed, had tested at more than .20 for blood alcohol concentration. The judge concluded that this circumstance would not influence her and that because she was not the trier of fact she deemed recusal to be unnecessary.

At the outset we note that our review of the record does not reveal any statements or actions on the part of the trial judge that in any way indicate the presence of bias toward this defendant. Nevertheless, recusal of a judge is required if "the judge's impartiality might reasonably be questioned." Iowa Code of Judicial Conduct, Canon 3D(1).

■ In interpreting Canon 3D, we have held that the considerations involved on a motion to recuse include assurances of objectivity, understanding of the concepts of the presumption of innocence and reasonable doubt, and recognition that the present defendant was not the one involved in the prior event. In addition, the length of time since the victimization, the similarity of the incidents, and the lack of acquaintance with the present victim are to be considered. *State v. Mann,* 512 N.W.2d 528, 533 (Iowa 1994). We have recognized the necessarily imprecise na-

ture of these considerations. *Id.* at 532. Disqualification is committed to the sound discretion of the judge. *State v. Smith,* 242 N.W.2d 320, 323–24 (Iowa 1976). The burden of showing error for failure to recuse is on the party seeking recusal. *Mann,* 512 N.W.2d at 532; *Smith,* 242 N.W.2d at 324. Based on the circumstances presented, we are unable to conclude that an abuse of discretion occurred in the present case.

We have considered all arguments presented and conclude that for reasons discussed in Division I of this opinion the judgment of the district court is reversed, and the case is remanded to that court for a new trial. The retrial shall be limited to the charges against defendant under Iowa Code section 707.6A(2)(a) and Iowa Code section 707.6A(4).

**REVERSED AND REMANDED.**

SNELL, S.J.* participates in lieu of STREIT, J., who takes no part.

#### ORDER

(February 7, 2002)

Following the filing of our decision, the State filed a petition for rehearing. At our direction, defendant has filed a response to that petition.

The crux of the State's petition is that our opinion was incorrect in finding Trooper Bulver's testimony concerning the effect of engine power on the momentum calculations of yawing vehicles to be recklessly false. Materials are annexed to the petition for rehearing, which were not provided by the State in regard to defendant's motion for new trial. These materials are additional pages from the Northwestern University Traffic Research Institute Manual referred to in our opinion. These pages of the manual describe experiments conducted with yawing vehicles that re-

corded slight deviations between velocity calculations from yaw marks from freewheeling vehicles and yaw marks from accelerating vehicles.

Had this information been provided as part of the district court record on the motion for new trial and had it been demonstrated that Trooper Bulver relied on these materials in giving his testimony, we doubtless would have softened our characterization of his testimony as being a reckless disregard for the truth. However, these experiments in no way corroborate the accuracy of the State's evidence of speed. The manual expressly states that calculations of velocity from yaw marks should not be attempted when the yaw marks are laid down following a collision. This is apparent from a reading of the manual and should have negated the witness and the prosecution from offering the challenged testimony. The petition for rehearing is denied. Ternus, J., takes no part.

---

* Senior Judge assigned by order pursuant to    Iowa Code section 602.9206 (2001).