**IN THE COURT OF APPEALS OF IOWA**

No. 24-0142
Filed April 9, 2025

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**TREVOR JAMES JOHNSTON,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Des Moines County, John M. Wright,

Judge.


        A defendant challenges the sufficiency of the evidence supporting his

convictions for first-degree theft and forgery.  **AFFIRMED.**


        Martha J. Lucey, State Appellate Defender, and Rachel C. Regenold,

Assistant Appellate Defender, for appellant.

        Brenna Bird, Attorney General, and Martha E. Trout, Assistant Attorney

General, for appellee.


        Considered without oral argument by Tabor, C.J., and Ahlers and

Sandy, JJ.

**TABOR, Chief Judge.**

A jury found Trevor Johnston guilty of first-degree theft and forgery in connection with a real estate deal. Johnston appeals, challenging the sufficiency of the evidence supporting both convictions. In doing so, Johnston focuses on his expert witness's opinion about the signatures on a purchase agreement and quitclaim deeds. After reviewing the evidence in the light most favorable to the State, we affirm.

## I.      Facts and Prior Proceedings

Teresa and Dickie lived in the same two-story home in Danville for more than three decades. Dickie bought the house in 1984; Teresa moved in when they married in 1990. The couple paid off the mortgage by 2008. But the house—built in the late 1800s—became too hard for them to maintain given their health issues. So, in 2022, they decided to sell the Danville house and find a ranch-style house closer to their son. The couple intended to use the sale proceeds to pay off the mortgage on their new house in Mount Pleasant so they "would still be debt free."

When they moved to their new house, Teresa put a for-sale sign in the front yard of their Danville home. She hoped to sell it for $110,000. Johnston saw the sign and called to set up a walk-through. A few days later, Teresa showed him around the old house. Right after the tour, Johnston told Teresa he wanted to buy the property. When she went to "write up a handwritten contract," Johnston explained that he flipped houses[1] and offered to get a purchase agreement from

---

[1] To "flip" a house means, rather than moving in, "the buyer intends to update and then resell the house for a profit." *See Robeoltman v. Hartkopp*, No. 23-1513, 2024 WL 2316658, at *1 (Iowa Ct. App. May 22, 2024).

his vehicle. Teresa sat down with Johnston and went through the purchase agreement "paragraph by paragraph" before signing and dating it. The purchase agreement stated that Johnston would provide $10 in earnest money credited towards the $110,000 purchase price at closing. Teresa asked Johnston for a copy of the purchase agreement, but he did not give her one.

A few days later, Johnston brought the purchase agreement to their new home in Mount Pleasant for Dickie to sign. Teresa and Dickie also signed a "Residential Property Seller Disclosure Statement" and a "Groundwater Hazard Statement." That same day, Johnston brought a quitclaim deed for the property to a local business, Mailboxes and Parcel Depot, so he could sign it before a notary public. But that deed was rejected by the auditor because its legal description of the property was inadequate.

After that rejection, Johnston contacted Teresa and Dickie, explaining he needed to correct the lot description and needed their signatures. So they met at a donut shop, and Johnston provided them with a "three-quarter-sheet piece of paper with just a legal description on it" for them to sign. They still did not have a closing date set when Teresa and Dickie would receive the remaining $109,990 owed by Johnston.

One week after his first visit, Johnston returned to Mailboxes and Parcel Depot and asked the same employee to notarize his signature on the front page of a second quitclaim deed. That same day, Johnston contacted a local real estate broker about selling the old home. He told the broker that he just wanted to make a quick sale for $95,000 because he had paid a good price for the home. Once

the county recorder's office showed the quitclaim deed had been filed, the broker listed the Danville home for sale.

A former neighbor alerted Teresa about the listing. But when Teresa called Johnston to find out what was going on, he would not answer until she called him from Dickie's cell phone. Teresa then met with the county recorder and auditor about the quitclaim deed that Johnston filed. According to the county recorder, Teresa was surprised and concerned that the deed had been filed as she still had not received the purchase payment from Johnston. After a county official alerted the broker that there was a dispute over the property, he pulled the listing.

Within days, law enforcement started investigating. That investigation led the State to charge Johnston with first-degree theft by deception and forgery. Before trial, Dickie died, so only Teresa testified to their version of events.[2] Teresa asserted that the purchase agreement had been altered after she signed it. She stated that the agreement did not include this paragraph:

> The buyer is aware that the [k]itchen needs remodeling and the corner in the basement needs improvement. Seller[s] shall give the buyer $109,990.00 in seller concessions, to be taken off the purchase price of the house, located at commonly known as [Danville address]. Seller[s] hereby agree to pay the Buyer not less than nor more than $50,000 upon cancellation of the contract.

Teresa also stated that neither she nor Dickie ever signed a quitclaim deed.

Johnston presented deposition testimony from an expert on forensic document examination. That expert examined the relevant documents and contended that the sellers' signatures were consistent across the documents, suggesting that one person signed Dickie's name to each document and one

---

[2] The notary, county recorder, and real estate broker also testified for the State.

person signed Teresa's name to each document. He also found "no characteristics of alteration" to the quitclaim deeds or the purchase agreement. But despite hearing the defense expert's opinions, the jury found Johnston guilty as charged. Johnston appeals, challenging the sufficiency of the evidence for his convictions.

## II. Scope and Standard of Review

We review sufficiency-of-the-evidence claims for legal error. *State v. Crawford*, 974 N.W.2d 510, 516 (Iowa 2022). A verdict is binding when supported by substantial evidence. *State v. Slaughter*, 3 N.W.3d 540, 546 (Iowa 2024). Evidence is substantial if it "would convince a rational fact finder the defendant is guilty beyond a reasonable doubt." *Crawford*, 974 N.W.2d at 516 (citation omitted). "We consider all evidence, not just the evidence supporting the conviction, and view the evidence in the light most favorable to the State, 'including legitimate inferences and presumptions that may fairly and reasonably be deduced from the record evidence.'" *State v. Ernst*, 954 N.W.2d 50, 54 (Iowa 2021) (citation omitted).

## III. Analysis

### A. Theft

First, Johnston attacks his theft conviction. For that charge, the district court gave the jury this marshaling instruction:

> The State must prove all of the following numbered elements of the crime of theft:
> 1. On or about the 13th day of January, 2022, [Johnston] did obtain the transfer of ownership of real property from Dickie and Teresa . . . .
> 2. [Johnston] knowingly deceived Dickie and Teresa . . . in one or more of the following ways:
>> a. Creating or confirming Dickie and Teresa['s] belief or impression as to the existence or nonexistence of a fact or condition which [Johnston] previously created or confirmed.

b. Failing to correct a false belief or impression as to the existence or nonexistence of a fact or condition which [Johnston] previously created or confirmed.

c. Preventing Dickie and Teresa . . . from acquiring information pertinent to the disposition of the property involved in the sale or transfer of their home.

d. Promising payment or other performance which [Johnston] did not intend to perform or knew he would not be able to perform. Failure to perform, standing alone, is not evidence that the actor did not intend to perform.

3. [Johnston] obtained the transfer of ownership of property from Dickie and Teresa . . . by the deception.

If the State has proved all of the numbered elements, [Johnston] is guilty.

Johnston does not contest any particular element. Rather, he generally attacks Teresa's testimony as not credible and highlights the opinions of his expert witness. But the jury was free to believe Teresa and reject the opinion of Johnston's expert. *See State v. Kolbet*, 638 N.W.2d 653, 660 (Iowa 2001) (recognizing "the jury was not bound to credit the testimony of the defendant's expert witness"); *State v. Thornton*, 498 N.W.2d 670, 673 (Iowa 1993) ("The jury is free to believe or disbelieve any testimony as it chooses and to give weight to the evidence as in its judgment such evidence should receive.").

When reviewing the record evidence in the light most favorable to the State, we find substantial evidence of Johnston's guilt. Johnston filed a quitclaim deed with the county recorder's office purporting to transfer ownership of the Danville house from Teresa and Dickie to himself. Teresa testified that she and Dickie never signed that deed. They were awaiting a payment of $109,990 before closing the sale. But rather than delivering a cashier's check for that balance, Johnston snuck a provision into the purchase agreement for $109,990 in "seller concessions" and a $50,000 penalty if Teresa and Dickie backed out. The jury

could have reasonably found that Johnston did so after Teresa and Dickie signed the purchase agreement and without their knowledge or consent.

Johnston's deception explains why he avoided Teresa's request for a copy of the purchase agreement. And the record supports the State's theory that Teresa and Dickie did not agree to sell their long-time home for just $10 or otherwise be subject to a $50,000 penalty. The State's evidence satisfied the elements of the marshaling instruction.[3] Johnston's conviction for first-degree theft is supported by substantial evidence.

### B. Forgery

Johnston also challenges the evidence supporting his forgery conviction. That marshaling instruction included these elements:

> 1. On or about the 13th day of January, 2022, [Johnston] made, completed, executed, authenticated, issued, or transferred a quitclaim deed and/or a purchase agreement.
> 2. Without Dickie and Teresa['s] authority [Johnston] made the quitclaim deed and/or purchase agreement appear to be the act of Dickie and Teresa . . . .
> 3. [Johnston] specifically intended to defraud or injure Dickie and Teresa . . . .

Johnston contests the second element, claiming that Teresa and Dickie "gave their authority for the transaction when they signed the documents," noting that "Teresa acknowledged the signatures were hers and [Dickie]'s."

What Johnston leaves out is Teresa's assertion that they never signed a quitclaim deed, nor did they sign the purchase agreement with the added paragraphs. The jury was free to credit that testimony. *See State v. Shanahan*,

---

[3] Johnston does not contest that the value of the Danville house exceeded $10,000, elevating his conviction to first-degree theft, a class "C" felony. *See* Iowa Code § 714.2(1) (2022).

712 N.W.2d 121, 135 (Iowa 2006).  Teresa clarified what documents they did sign—the purchase agreement without the added paragraphs, the disclosure statement, the groundwater hazard statement, and "the three-quarter piece of paper" that included the property description.

Incriminating in his alacrity, after Johnston secured the sellers' signatures on those documents, he rushed to the notary[4] and tried to file a quitclaim deed along with the modified purchase agreement.  Given Teresa's insistence that she and Dickie did not sign a quitclaim deed or the purchase agreement with the added paragraphs, the jury could have reasonably concluded that Johnston secured their signatures for use on those documents to give the false appearance of their approval and without the authority to do so.  That satisfies the second element of forgery.  Johnston's challenge to the sufficiency of evidence supporting his conviction for forgery fails.

**AFFIRMED.**

---

[4] At trial, the notary clarified that although she notarized the quitclaim deed, she did not see Teresa or Dickie sign any documents.  She only witnessed Johnston's signature on the front of the quitclaim deed.  She agreed it was a mistake to notarize Johnston's signature as she had because it gave the impression that she witnessed Teresa's and Dickie's signatures when she had not.